## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | **:** | |
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No.: 1:24-CR-00177-TNM** |
| | **:** | |
| **JASON HOWLAND,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jason Howland to 24 months' incarceration, three years of supervised release, a fine, $2,000 in restitution, and a special assessment of $100. The government's incarceration request represents an 18-month variance above the high end of Howland's Guidelines range to account for Howland's: (1) intent to prevent Congress from certifying the results of the 2020 presidential election, (2) calls for "War" on January 6, and (3) hour inside the Capitol during the riot.

### I.    INTRODUCTION

The defendant, Jason Howland, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in

1

losses.[1]

In the days leading up to January 6, Howland called for "War." On January 6, he showed that he meant those words. Howland made sure he was on the front lines of the riot, yelling "Let's go!" and pushing forward as rioters around him violently assaulted U.S. Capitol Police officers near the Northwest Scaffolding. Howland entered the building within minutes of the initial breach of the Senate Wing Door and remained inside the Capitol for approximately one hour—where he watched rioters violently assault officers, refused to leave the building even though he knew Congress had been forced into hiding, and screamed at police officers who were trying to get him and other rioters out of the building. After officers got him out of the Capitol, yet while the building remained on lockdown and the Joint Session in recess, Howland proudly declared that it was not Antifa that attacked the Capitol, but "patriots"—remarking ominously that "Congress knows who it was."

The government recommends that the Court sentence Howland to 24 months of incarceration for his conviction of violating 18 U.S.C. § 231(a)(3). A 24-month sentence reflects the gravity of Howland's conduct, but also acknowledges his admission of guilt.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

II.    **FACTUAL BACKGROUND**

A.    **The January 6, 2021 Attack on the Capitol**

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 24, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.    **Howland's Role in the January 6, 2021 Attack on the Capitol**

*Pre-January 6 Social Media and Text Messages*

Howland's tweets from December 2020 show his focus on what would happen in Congress on January 6. Howland's twitter exchanges referred to the joint session of Congress, the role of Vice President Mike Pence, the counting of the Electoral College votes, and included parts of the Electoral Count Act.[2] *See* Images 1 and 2.

---

[2]    In December 2020 and January 2021, Howland controlled the Twitter account @Jason_Howland. SOO, ECF No. 24 ¶ 8



*Image 1: Howland Twitter thread about the Joint Session*



*Image 2: Howland Twitter thread about VP Pence and the Joint Session*

In other tweets about the joint session, Howland alluded to taking action if necessary, *see* Image 3, and told others he would see them at the Capitol, *see* Image 4.



*Image 3: Howland tweet from December 2020*

5



*Image 4: Howland tweet from December 2020*

In Howland's private text messages, he delivered more ominous warnings about what would come on January 6. On January 5, 2021—the day before Congress was set to meet in the Joint Session—Howland texted with Individual 1 about the U.S. Senate runoff election in Georgia happening that day. Howland wrote to Individual 1: "Stopped counting in the senate race. Same as last time. War. That's it. War. Nothing else. Whoever doesn't is the enemy," then wrote "Now they called Warnock." Seconds later, over three successive messages, Howland wrote "War" "War" "War." Individual 1 responded: "Chill out wait and see how this plays out." Howland responded: "I've been waiting. Fuck that." Individual 1 responded: "No one wants to go to war tomorrow. Just wait and see," to which Howland replied "I do. I am." SOO ¶ 9. Less than twenty-four hours later, Howland was inside the Capitol as part of a violent mob that threatened the safety of members of Congress and temporarily halted the peaceful transfer of power.

### *Howland's Actions at the Capitol*

On January 6, 2021, Howland joined a large group of rioters that assembled at the base of the Northwest Scaffolding, where U.S. Capitol Police officers had formed a police line to prevent unauthorized individuals from advancing closer to the Capitol building. Rioters directly in front of Howland began to assault officers and attempt to overrun the police line. SOO ¶ 10. Howland observed this and, in response, turned to the crowd behind him and yelled "let's go" and waved his arm forward twice. Immediately after Howland yelled "let's go," he and other rioters began to

push forward, overrunning the police line and advancing toward the Capitol. *Id.*; Image 5.[3]



*Image 5: Howland yelling "Let's go" and waving forward as rioters assault officers*

As Howland advanced forward with the crowd, he pushed on the back of individuals in front of him. SOO ¶ 10. At approximately 2:17 p.m., Howland entered the Capitol through the Senate Wing Door, a mere five minutes after another rioter smashed an adjacent window in the first breach of the building. SOO ¶ 11; Image 6.

---

[3] A copy of this video, labelled "US v. Howland Govt. Sent. Ex. 1," is being provided to the Court via USAfx.



*Image 6: Howland entering the U.S. Capitol through the Senate Wing Door*

Howland then entered the U.S. Capitol's Crypt, where he observed another line of U.S. Capitol Police officers attempting to prevent rioters from advancing further into the Capitol. Howland and other rioters chanted, as more and more of the mob streamed into the Crypt. As the crowd swelled, Howland watched as other rioters assaulted officers and overran the police line. SOO ¶ 12; Image 7.



*Image 7: Howland in the Crypt as rioters overrun the police line*

Evidence recovered from Howland's iCloud account showed that he was tracking what was happening with the Joint Session of Congress even while inside the building. At approximately 2:20 p.m., while inside the Crypt, Howland received and read a message from Individual 2 telling him that "Congress in session just figured out u guys are there and went running out of the session. Now on recess n house on lockdown." SOO ¶ 13.

After the mob overran the police line, Howland walked back and forth between the Crypt and the Crypt Lobby East before making his way to the second floor of the Capitol. At approximately 2:51 p.m., Howland entered the Capitol Rotunda. SOO ¶ 14. There, Howland watched as Metropolitan Police Department ("MPD") officers and U.S. Capitol Police officers entered the Rotunda and attempted to clear rioters from the building. Rather than go toward an exit, Howland approached the police line, getting within feet of the officers. *Id.*; Image 8.



*Image 8: Howland approaching the police line in the Rotunda*

In MPD body-worn camera, Howland is seen approaching officers who are directing rioters to exit the Capitol building. Image 9.



*Image 9: Howland being directed to leave the Rotunda*

At approximately 3:06 p.m., Howland entered the East Foyer. As he entered, he yelled at a group of U.S. Capitol Police officers. SOO ¶ 15; *see* Images 10 and 11.[4]

---

[4] A copy of the video screenshotted in Image 11, labelled "US v. Howland Govt. Sent. Ex. 2," is being provided to the Court via USAfx.



*Image 10: Howland yelling at USCP officers*



*Image 11: Howland yelling at USCP officers*

After yelling at the officers in the East Foyer, Howland remained inside the Capitol. It was not until approximately 3:17 p.m.—an hour after he unlawfully entered the building—that Howland finally exited through the Rotunda Doors. SOO ¶ 16. Even after he exited the building, Howland stayed on the East Plaza, where he stood among the mob and yelled at law enforcement officers who were arriving at the Capitol to respond to the riot. SOO ¶ 17; Image 12.



*Image 13: Howland yelling at arriving law enforcement officers on the East Plaza*

As law enforcement officers were still clearing the Capitol grounds of rioters, and as Congress remained in recess, Howland boasted of what he and his fellow members of the mob had accomplished. At approximately 5:28 p.m., Individual 1 texted Howland asking whether antifa had broken into the Capitol. Howland replied "I'm not going to tell you who specifically. It wasn't antifa. It was patriots," then added in a successive message "No. Not Antifa. For a fact." When Individual 1 told Howland: "Well everyone on Twitter and all over is assuming it was Antifa. So that's awesome," Howland replied "*Good. Congress knows who it was.*" SOO ¶ 18 (emphasis added).

Howland espoused the same pride in a January 6 tweet responding to a post by a member of Congress earlier in the day about members being locked in the House Chamber. Image 14. Howland claimed that "Patriots" were the ones who breached the Capitol's security. *Id.* In another post, Howland claimed that events like the riot at the Capitol "need[] to happen daily." Image 14.



*Image 13: Howland tweet related to riot at the U.S. Capitol*



*Image 14: Howland tweet related to riot at the U.S. Capitol*

## III.    THE CHARGES AND PLEA AGREEMENT

On April 10, 2024, a federal grand jury returned an indictment charging Howland with six counts, including civil disorder, in violation of 18 U.S.C. § 231(a)(3), and obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). On September 23, 2024, Howland was convicted of civil disorder, in violation of 18 U.S.C. § 231(a)(3), based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Howland now faces sentencing on civil disorder, in violation of 18 U.S.C. § 231(a)(3). As

noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Howland faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100. *See* Plea Agreement, ECF No. 23 at 1; PSR ¶¶ 114, 120, 124, 132, 133, 136.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The plea agreement set out the Guidelines analysis, ECF No. 23 at 3, which is reflected accurately in the PSR ¶¶ 37–47. That Guidelines analysis follows:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -2 |
| | **Total** | **8** |

*See* PSR ¶¶ 39–47.

Because Howland received 1 criminal history point, U.S.S.G. § 4C1.1 does not apply. *See* PSR ¶ 61; Plea Agreement, ECF No. 23 at 3–4.

The U.S. Probation Office calculated Howland's criminal history as category I, which is not disputed. PSR ¶ 62. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 8, Howland's Guidelines imprisonment range is 0 to 6 months' imprisonment. Howland's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained in this memo.

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)–(c). Because Howland's Guidelines range does not capture

the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court vary upwards from the top of the Guidelines range.

Howland was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers, and resulted in more than $2.9 million in losses. Howland's offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Howland "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As this Court put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent. Tr. 9/22/22 at 86–87.

But nothing in Howland's Guidelines calculation reflects these facts. Howland would face the same offense level if his crime had not endangered the democratic process or interfered with the peaceful transfer of power.[5] There is no specific offense characteristic in the Guidelines for

---

[5] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 144 S. Ct. 2176 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

attacking democracy or abandoning the rule of law. So, a sentence within Howland's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. "January 6th wasn't an ordinary violent riot but one that interfered with the counting of electoral votes and the peaceful transition of power, which is one of the bedrocks of our democracy." *United States v. Perkins*, 21-CR-147-CJN, Sent. Tr. at 53.

Indeed, even before *Fischer*, judges in this district, including this Court on numerous occasions, gave significant upward departures and variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

16

Recently, in *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15–21 months' imprisonment. Judge Kelly found it important that, despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" that "posed a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sent. Tr., at 87–88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94–95. Because Sparks's advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks's advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson*

17

Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id*. at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Likewise, in *United States v. Dunfee*, 23-CR-36-RBW, Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(a)(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power." *See United States v. Dunfee*, 23-CR-36-RBW, ECF No. 90, at 2. From an advisory range of 18–24 months, the court sentenced Dunfee to 30 months of imprisonment.

Most recently, in *United States v. Oliveras*, 21-CR-738-BAH, Judge Howell sentenced a defendant on a § 231(a)(3) conviction, a § 111(a)(1) conviction, and four misdemeanors, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Howell found an upward departure was warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function) because after Fischer, with the dismissal of [the defendant's] 1512(c)(2) conviction, none

> of the conduct that goes into determining defendant's sentencing guidelines reflect
> his intent to engage in political violence that poses such a threat to our American
> democracy…    His intent to obstruct Congress in the Electoral College certification
> by violence, if necessary, go above and beyond what any of his current convictions
> now take into account.

*Oliveras*, 21-cr-738 (BAH), Sentencing Tr. at p. 49. The court noted that "[i]n assessing the extent

of the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G.

§] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide . . . [and] an upward

departure within that range is appropriate." *Id.* at 49–50. The court also noted that it "would impose

the same sentence with . . . an upward variance for the same reasons that are outlined in 5K2.7 and

consideration of the 3553(a) factors." *Id.* at 97. From an advisory Guidelines range of 37–46

months' imprisonment, the court sentenced Oliveras to 60 months of imprisonment.

Because the seriousness of Howland's crime is not adequately captured by the applicable

Guideline, an upward variance is appropriate here as well. An upward variance is appropriate when

"the defendant's conduct was more harmful or egregious than the typical case represented by the

relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir.

2018) (cleaned up). While the Supreme Court's decision in *Fischer* foreclosed prosecuting

Howland under 18 U.S.C. § 1512(c)(2), "*Fischer* does not dictate the Court's application of the 18

U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on

January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to

take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-

RCL, ECF 507, Sent. Tr. at 4-5 (cleaned up).  Indeed, "*Fischer* does not mean that I cannot

consider at sentencing evidence that establishes that the defendant intended to obstruct Congress'

certification of the electoral vote in determining whether . . . the resulting guideline range fully

accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*,

21-CR-708-RCL, ECF 151, Sent. Tr. at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

In past sentencings, this Court has made clear its view that January 6 was "a national embarrassment," *United States v. Hatchet Speed*, 22-CR-244-TNM. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[6]

In addition to departing upwards, other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt*, 21-CR-32-DLF, Mem. Op. and Order 4/10/24 at 10–11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-638-TJK, Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512

---

[6] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[7]

In this case, the government submits that an upward variance to 24 months is warranted to reach an appropriate sentence. As discussed below, similarly situated defendants have received similar sentences.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[7] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Howland's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Howland called for war on January 5, and on January 6 he showed that was not just rhetoric when he joined rioters who overran the police, entered the Capitol minutes after the initial breach, and marched through the building for an hour knowing that members of Congress had been forced into hiding. The nature and circumstances of Howland's offense were of the utmost seriousness, and fully support the government's recommended sentence of 24 months' incarceration.

### B.    The History and Characteristics of the Defendant

From 2022 through present, Howland has been self-employed in the home renovations business. PSR ¶ 90. Howland has a significant and violent history of arrest and conviction which weighs in favor of a lengthy period of incarceration.

Most serious among Howland's many prior convictions is a 2006 guilty plea to "Ethnic Intimidation" and "Attempt[ed] Assault with a Dangerous Weapon" in St. Clair County, Michigan. PSR ¶ 59. According to the Michigan Department of Corrections' presentence report for that conviction, Howland repeatedly yelled the N word at a group of three African American children who were playing at a park.[8] When confronted by the children's mother, Howland picked up a shovel, threatening to hit her with it and calling her the same racial slur. Howland pleaded guilty to the two offenses listed above and was initially sentenced to 18 months' probation. On June 26,

---

[8] The PSR contains the exact quotes from the Michigan Department of Corrections' presentence report, including the racial slur that Howland yelled at the children. *See* PSR ¶ 59.

2008, however, Howland was found to be in violation of probation and sentenced to 365 days'

imprisonment. *Id.*

In additional to the conviction described above, Howland has the following convictions:

- Open Alcohol on a Motor Vehicle (March 19, 1995) — Pleaded guilty and fined $125. PSR ¶ 51.

- Receiving and Concealing Stolen Property Less than $100 (March 31, 1996) — Pleaded guilty and fined $200 and restitution ordered. PSR ¶ 52.

- Solicitation of a Felony (November 8, 1996) — Pleaded guilty and initially sentenced to probation, but later sentenced to a term of imprisonment for a subsequent offense. PSR ¶ 53.

- Operating Under the Influence of Liquor (September 11, 1998) — Pleaded guilty and sentenced to 2 years' probation, 90 days' jail, $1,315 in fines and costs. PSR ¶ 54.

- Disturbing the Peace (March 11, 2000) — Pleaded guilty and fined $460. PSR ¶ 55.

- Driving While License Suspended (October 18, 2000) — Pleaded guilty and fined an unknown amount. PSR ¶ 56.

- Felony Assault with a Dangerous Weapon (October 10, 2001) — The probation department and the government have not been able to obtain details about the circumstances of this offense. Howland pleaded guilty and was sentenced to "2 years probation, 90 days on tether" and fined. PSR ¶ 57.

- Driving While License Suspended (December 4, 2001) — Pleaded guilty and fined. PSR ¶ 58.

- Operating While License Suspended, Revoked Denied (July 10, 2011) — The PSR does not reference whether this case resolved by plea or trial. Howland was sentenced to 5 days' confinement and fined. PSR ¶ 60.

- Operating While License Suspended – Second or Subsequent Offense (July 16, 2011) — The PSR does not reference whether this case resolved by plea or trial. Howland was sentenced to 33 days' confinement. PSR ¶ 61. Howland received 1 criminal history point for this offense.

Unlike some other rioters, Howland was not a first-time offender. His crimes on January 6

added to his long list of arrests, which included the racially charged offenses detailed above and

one other felony assault conviction. Howland's criminal history demonstrates a propensity towards violence that is concerning, particularly in light of his reporting "no major problems during his upbringing." *See* PSR ¶ 69. Howland's history and characteristics, including his history of arrest and conviction for violent assaults and history of violent rhetoric, weigh heavily in favor of a lengthy term of incarceration.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Howland's criminal conduct on January 6 was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a lengthy term of incarceration.

First, although Howland has a criminal history category of I, his history of arrest and conviction shows a clear pattern of criminal behavior — including violent, threatening, and racially charged conduct. *See* Section VI(B) *supra.*

Second, Howland's conduct was clearly designed to obstruct the Joint Session and prevent Congress from certifying the votes of the Electoral College. Howland's tweets from the weeks leading up to January 6 show his intense focus on what would happen in Congress that day. Howland's private text messages from January 5 calling for "War" on January 6 give the clearest picture of his knowledge and intent going into January 6. And his actions on January 6 show that he was willing to put his rhetoric into action—positioning himself toward the front of the mob that overran police at the northwest scaffolding, then illegally occupying the Capitol for an hour, knowing that his and the mob's actions had halted the peaceful transfer of power.

Third, although Howland has now expressed remorse and contrition, his social media statements after January 6 were those of a man girding for another battle. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). In the immediate aftermath of the attack, Howland's boasting that "[p]atriots" stormed the Capitol and that the events of January 6 "need[] to happen daily," demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of violent assault and rhetoric.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section

3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[11]

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24–25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While Howland pleaded guilty to civil disorder, 18 U.S.C. § 231(a)(3), rather than obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2), following the Supreme Court's decision in *Fischer*, prior cases that involved § 1512(c)(2) offenses provide useful comparators.

*United States v. Gilbert Fonticoba*, 1:21-cr-00638 (TJK). After a stipulated bench trial, Judge Kelly found Fonticoba guilty of violating 18 U.S.C. §§ 1512(c)(2), 2 and 18 U.S.C. § 231(a)(3). He was sentenced to 48 months of incarceration for his participation in the January 6 riot. Fonticoba went to Washington D.C. on January 6, 2021 as part of the Proud Boys' "Ministry of Self Defense"—a small contingent of Proud Boys, hand selected ahead of January 6 who communicated openly about potential violence during the Joint Session. He tore down fencing on the West side of the Capitol building and was part of a surge that overwhelmed officers and successfully moved the crowd onto the stairs. He ultimately made it into the building, where he remained for a few minutes.

While Fonticoba's participation in the Proud Boys' Ministry of Self Defense warranted a higher sentence than the one requested here, his case remains a useful comparator. Like Howland, Fonticoba prepared for the events of January 6. Both were aware of the importance of the certification and were present at the Capitol to disrupt it. Unlike Howland, Fonticoba spent only a few minutes inside, whereas Howland spent an hour inside and remained even after learning that Congress had been forced into recess. Additionally, both defendants were among the first rioters that breached police lines at the Capitol. Finally, both men expressed that they were proud of what

they had done, with Howland bragging in text messages to Individual 1 that it was "patriots," not antifa, who breached the Capitol.

*United States v. Timothy Louis Hale-Cusanelli*, 1:21-cr-00037 (TNM). Hale-Cusanelli was convicted after a trial of 18 U.S.C. §§ 1512(c)(2) and four misdemeanors. For his conduct he was sentenced to 48 months in prison. The Court did not apply enhancements under 2J1.2(b)(1)(B) and (b)(2), making Hale-Cusanelli's guidelines 21–27 months. Despite that, the Court applied an upward variance. On January 6, 2021, Hale-Cusanelli, who was enlisted in the United States Army Reserves, went to the U.S. Capitol where he, like Howland, screamed at and interfered with USCP officers. Like Howland, Hale-Cusanelli waived rioters forward. Hale-Cusanelli made it into the Capitol building where he tried to prevent an officer from arresting another rioter. After January 6, Hale-Cusanelli made violent and racist remarks that factored into the Court's decision to vary upward. Howland's remarks after January 6 may not have been racist but are undeniably dangerous. Howland called rioters patriots and suggested that events like the attack on the Capitol should "happen daily."

*United States v. Joshua Johnson*, 1:22-cr-00080 (CRC). Johnson pleaded guilty to obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2), and Judge Cooper sentenced him to 24 months' imprisonment. During a custodial interview, Johnson told agents that he entered the Capitol intending to stop Congress from certifying the Electoral College votes, just like Howland. And, like Howland, Johnson remained in the Capitol for an extended period even after learning that Congress had been evacuated due to the riot. Unlike Howland, Johnson entered the Senate floor, where he rummaged through the desks of evacuated senators. According to sentencing filings, however, Johnson did not appear to repeatedly confront officers as Howland did when he

aided other rioters in overrunning police lines and later screamed at officers in the East Foyer and on the East Plaza.

Looking at a comparator case involving only an 18 U.S.C. § 231(a)(3) conviction without substantial evidence of intent to obstruct the Joint Session supports the argument that Howland's Guidelines range does not completely account for his criminal conduct. In *United States v. Ryan Yates*, 23-CR-372-TNM, the defendant was convicted of civil disorder, 18 U.S.C. § 231(a)(3), following a guilty plea. Yates, like Howland, was part of the mob at the base of the northwest scaffolding, then entered the Capitol through the Senate Wing Door seconds apart from Howland. Like Howland, Yates spent roughly an hour inside the Capitol, traversing the building before finally exiting through the Rotunda Doors three minutes after Howland did the same.

While Yates's offense, unlike Howland's, involved physical contact with an officer, the evidence presented at Yates's sentencing did not show the premeditated intent to disrupt the official proceeding that Howland's pre-January 6 statements establish. Nor did the evidence presented at Yates's sentencing show calls for violence on January 6, unlike Howland's January 5 messages saying he wanted "War" on January 6. This Court sentenced Yates to 6 months' incarceration, followed by 24 months' supervised release that included 3 months' home detention. Given the strong evidence of Howland's intent to obstruct the Joint Session and pre-January 6 violent rhetoric, a longer term of imprisonment than what the Court sentenced Yates to is appropriate here.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[12] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078–79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Howland must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6.[13] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Howland's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

---

[12] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[13] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII. FINE

Howland's conviction for violating 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, although represented by a court-appointed attorney, Howland has not shown an inability to pay. Howland's financial condition, as outlined in the PSR, shows significant assets and monthly income. PSR ¶¶ 96–97. Indeed, the PSR lists Howland as owning or leasing seven vehicles. PSR ¶ 96. Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $2,000 to $20,000. U.S.S.G. § 5E1.2(c).

**IX.     CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months' incarceration, three years of supervised release, a fine, $2,000 in restitution, and a special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Terence A. Parker*
TERENCE A. PARKER
Trial Attorney (Detailee)
NY Bar No. 5775192
601 D St., NW
Washington, D.C. 20001
(202) 252-7859
Terence.Parker3@usdoj.gov